EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
FRANK D. KORTUM
Assistant United States Attorney
California State Bar No. 110984
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-5710
Facsimile: (213) 894-7177
E-mail: Frank.Kortum@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TWO LLADRO SCULPTURES,<br>Defendant. | No. CV 15-05962<br>**VERIFIED COMPLAINT FOR FORFEITURE**<br>18 U.S.C § 981(a)(1)(C)<br>[F.B.I.] |

The United States of America brings this claim against the defendant Two Lladro Sculptures, and alleges as follows:

**JURISDICTION AND VENUE**

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C).

2. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C.

§ 1395(b).

**PERSONS AND ENTITIES**

4. The plaintiff is the United States of America.

5. The defendant is two Lladro sculptures, respectively valued in 2012 at $5,500.00 (Radha Krishna sculpture) and $4,500.00 (Shiva Nataraja sculpture), and seized on February 8, 2012 by the Federal Bureau of Investigation ("F.B.I.") during the execution of a seizure warrant at the Ocoee, Florida residence of Suraj A. Patel ("Patel").[1]

6. The defendant is currently in the custody of the United States Marshals Service in this District, where it shall remain subject to the jurisdiction of this Court during the pendency of this action.

7. The interests of Patel, Rudy Rampertab ("Rampertab"), and Macy's Inc. ("Macy's") may be adversely affected by these proceedings.

**FACTS SUPPORTING FORFEITURE**

8. Beginning in 2011, the F.B.I. investigated a fraud scheme that Patel and Rampertab perpetrated against Macy's. Macy's owns and operates Macy's Department Stores throughout the United States.

9. The products that Macy's sells at its stores are shipped to the United States from overseas manufacturers to various Macy's warehouses in the United States, including a warehouse facility located in Carson, California (the "Carson facility"). The products are then transported from Macy's warehouses by truck to Macy's distribution centers and from the distribution centers the products are transported to their final destinations, Macy's department

[1] Pursuant to Local Rule 5.2-1, the address of the residence has been omitted.

stores.

10. Damco Distribution ("Damco") is a vendor Macy's uses to manage the Carson facility. Damco is responsible for the transportation of Macy's products from west coast seaports to the Carson facility, and then to selected Macy's distribution centers.

11. Rampertab was employed by Macy's for approximately 22 years. Rampertab originally worked for Macy's in New York, then transferred to California in 2001 when Macy's opened the Carson facility. Rampertab eventually became the Director of Logistics of the Carson facility. Rampertab's supervisor was Lynne Jergensen ("Jergensen"), who was headquartered in New York. Rampertab's responsibilities at the Carson facility involved supervising the work performed by Damco and insuring that products that Macy's imported were cleared through customs and transported to Macy's distribution centers on schedule. In addition, Rampertab reviewed vendor payment invoices submitted to Macy's from authorized vendors, such as Damco, for the transportation of Macy's products to and from the Carson facility.

12. Rampertab was the only Macy's employee at the Carson facility authorized to approve vendor invoices. Rampertab would verify that the services that the vendor billed on the invoice actually reflected the services that the vendor provided. Rampertab would then approve the invoice, which would be submitted to Macy's in New York for payment.

13. From time to time, Macy's would hire additional trucking companies to transport products throughout the country. When the need arose, Rampertab would contact Damco to help secure the services of additional trucking companies to transport products from Macy's

warehouses to Macy’s distribution centers. In addition, Rampertab was authorized to locate and refer transportation companies to Damco if Damco was unable to meet Macy’s product transportation demands. As Director of Logistics, Rampertab was responsible for locating and hiring additional transportation companies to transport Macy's products as the need arose.

14. In July 2010, Rampertab contacted Jergensen and told her that the Carson facility was running out of trucks to transport Macy’s products. (In fact, there was no shortage of trucks.) Rampertab told Jergensen that Rampertab had found a new trucking company, SAP, which he wanted to use as a vendor because there were no other trucking companies available. Rampertab approved the use of (A) SAP as a vendor to provide transportation services to the Carson facility, and (B) Cost Plus as a vendor to provide other services to the Carson facility. Rampertab failed to reveal to Jergensen that the owner of SAP and Cost Plus was Patel, Rampertab's domestic partner.

15. After Rampertab approved SAP and Cost Plus as vendors, SAP and Cost Plus immediately began submitting invoices to Macy’s for payment. Rampertab personally approved the invoices that SAP and Cost Plus submitted.

16. Macy’s Logistics Analyst Lyneisha Brooks (“Brooks”) worked for Rampertab at the Carson facility. One of Brooks’ job responsibilities at the Carson facility was to audit vendor invoices for accuracy and completion before Brooks forwarded the invoices to Rampertab or, depending on the amount of the invoice, to Jergensen for payment approval. (Jergensen’s payment approval authority was higher than Rampertab’s.) Previously, it had been standard procedure

for authorized vendors to submit their invoices directly to Brooks, who would audit the invoices before forwarding the invoices for further review and payment approval to Rampertab or Jergensen. Instead of following this procedure, SAP and Cost Plus submitted their invoices directly to Rampertab. Brooks was therefore unable to audit the invoices submitted by SAP and Cost Plus. Rampertab would approve the invoices submitted by SAP and Cost Plus and then give the approved invoices to Brooks for final processing.

17. During an internal investigation conducted by Macy’s it was discovered that Rampertab had made it appear as though the invoices from SAP and Cost Plus were being audited by Brooks. Rampertab told Jergensen that Brooks was auditing SAP and Cost Plus invoices submitted to Macy’s for payment, when in fact (A) no audit of SAP and Cost Plus invoices had been performed; and (B) Rampertab had ordered Brooks to report to Jergensen that she was auditing SAP and Cost Plus invoices even though no audits had been performed. Brooks eventually contacted Jergensen and told Jergensen that Rampertab had ordered (A) that SAP and Cost Plus invoice audits not be completed; and (B) Brooks to report that the audits had taken place.

18. Macy’s paid SAP and Cost Plus for their submitted invoices based solely on Rampertab’s approval. Some of the invoices submitted by SAP and Cost Plus were for services actually provided by SAP and Cost Plus to Macy’s, but other invoices that Macy’s paid were fraudulently submitted for services never provided by SAP or Cost Plus. Macy’s internal investigation identified approximately 126 invoices submitted by SAP for services SAP never provided to Macy’s. Macy’s paid the fraudulent invoices submitted by SAP based solely on Rampertab’s approval.

19. Once the invoices from SAP and Cost Plus were approved by Rampertab, the SAP and Cost Plus invoices (along with all approved invoices) were sent to Macy’s in New York via U.S. Mail, facsimile or email. Macy’s in New York would forward the SAP and Cost Plus invoices to Macy’s finance department in Ohio for payment.

20. Macy’s finance department in Ohio paid SAP and Cost Plus based on Rampertab’s approval of the submitted invoice amounts. Macy’s mailed checks to SAP and Cost Plus. Macy’s checks made out to SAP and Cost Plus for payment of the approved invoices, whether fraudulently submitted or legitimate, were deposited to (A) a Bank of America account ending in ‘0819 (“BofA account-A”) in the name of Suraj Patel, doing business as SAP Retail Transportation; and (B) a Bank of America account in the name of Suraj Patel, doing business as Cost Plus Packaging (“BofA Account-B”).

21. After Macy’s internal investigation began Rampertab attempted to resign from Macy's. Before Rampertab could do so, Macy’s officially terminated Rampertab in January 2011. Sometime during December 2010 and January 2011, Rampertab approached a Macy's employee at the Carson facility to “wipe” his computer and to help Rampertab retrieve files from Rampertab’s office at the Carson facility.

22. BofA Account-A was opened in 2010 with a $25 deposit. Between July 15, 2010 and January 5, 2011, approximately $3.6 million was deposited in BofA Account-A. Approximately $3.4 million of those deposits were payments from Macy's for invoices submitted for SAP. Approximately $175,000 of the deposits to BofA Account-A were transferred from BofA Account-B. Deposits from Macy's to BofA Account-A represented approximately 94% of all the deposits to BoA

Account-A.

23. Between July 15, 2010 and January 5, 2011, Macy's paid SAP and Cost Plus approximately $3.9 million, of which approximately $3.4 million was deposited to BofA Account-A. Of that $3.4 million, Macy's paid SAP approximately $930,865.23 based on fraudulently submitted and approved SAP invoices for services SAP never provided to Macy's.

24. On January 6, 2011, Patel purchased the defendant, along with a diamond ring, for a total of $12,875.00 from Bhindi Jewelers, located at 18508 Pioneer Blvd., Artesia, California. (The receipt issued by Bhindi Jewelers did not break out the price of the individual items purchased.) Patel purchased the defendant and the ring using a Visa debit card with an account number ending in ‘9062 (“Visa Debit Card ‘9062”), in the name of Suraj A. Patel. As purchases were made on Visa Debit Card ‘9062 (including the purchase of the defendant), the amount of the purchase would be withdrawn from BofA Account-A.

25. Rampertab and Patel used the fraudulently deposited payments in BofA Account-A to purchase not only the defendant but also a BMW, an Aston Martin (which was later sold), jewelry, and six Florida real properties. The government has filed a civil forfeiture action in this District against the six Florida real properties, entitled United States v. One Real Property Located in Oconee, Florida et al., CV 12-1802 SJO (AGRx).

26. Based on the facts set forth above, plaintiff alleges that the defendant represents the proceeds of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. The defendant is therefore subject to forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the defendant, due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed, that this court decree forfeiture of the defendant to the United States of America for disposition according to law, and for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: August 6, 2015

EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/
FRANK D. KORTUM
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, JESSIE MURRAY, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled United States of America v. Two Lladro Sculptures.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6, 2015 in Santa Ana, California.

JESSIE MURRAY
Special Agent-FBI